<hr />

ANNIE McKEE et al.

*v.*

JOHN W. GRIGGS et al., trustees.

1. An action cannot be maintained in equity, any more than at law, on a parol contract for an interest in lands, when the defendant, by his answer, denies the contract.

2. M., a married woman, living separate from her husband, was the former owner of three tracts of land, which were afterwards sold at sheriff's sale on foreclosure to A., the mortgagee. A., by agreement with M., held his bid for the property for M.'s benefit as well as his own security. A. afterwards sold one tract at an advance and credited such advance on M.'s indebtedness, leaving some $1,600 still due A. M. then negotiated a loan, in her own name, of $7,000, with an insurance company, on the two remaining lots. S. had for years been the personal friend of M., had advised her in her business affairs, and particularly as to this property, and had full knowledge of the agreement between A. and M. to hold it for her benefit. S., with M.'s consent, had himself substituted in her place in the loan from the insurance company, took title from the sheriff under A.'s bid, made the mortgage to the insurance company, and with the proceeds thereof and $1,683.67 of his own money paid off all prior encumbrances on the property, including A.'s debt. The property at the time was worth from $1,400 to $7,600 more than the insurance company's mortgage and the amount advanced by S.—*Held*, that S. occupied a position of trust and confidence towards M. in the transaction, and must be held to have acted therein as her trustee, and that the deed must be construed to be a mortgage to secure S. for the money paid out by him in clearing off the encumbrances.

<hr />

On bill, answer, replication and proofs in open court.

*Mr. Eugene Stevenson,* for the complainants.

*Mr. Eugene Emley,* for the defendants.

GREEN, V. C.

Mary Ann McKee, wife of James McKee, on the 2d of October, 1877, was seized in fee of three parcels of land in the city of Paterson. Plot No. 1 being the northeast corner of Willis street and Sedgwick avenue, one hundred feet square, was subject to a mortgage held by John H. Harbeck, Jr., for $5,700, which was then due. Plot No. 2, a lot on Main street, twenty-five feet from Slater street, being twenty-five feet by one hundred, was subject to a mortgage held by Henry Cowan for $2,300. Plot No. 3, a lot twenty-five feet by one hundred, on the northeast corner of Main and Slater streets, was subject to a mortgage held by the Mutual Life Insurance Company for $2,500, which was the first lien, and also to a mortgage to John Hinchliffe for $700. There were houses on all these different tracts.

Mr. Harbeck, at the time mentioned, was pressing for payment of his mortgage; there was a dispute between him and James McKee with reference to a claim which the latter insisted should be allowed by Harbeck in settlement.

Robert Adams effected an arrangement with Mr. Harbeck by which he agreed to take in settlement a bond from Mr. Adams for $3,000, payable in one year, Harbeck to retain his mortgage as security for the payment of Mr. Adams' bond.

This arrangement was agreed to by the McKees, who furthermore agreed to secure Mr. Adams by a bond and mortgage upon the three tracts, conditioned for the payment of $3,000, with interest, if Adams was required to pay that amount to Mr. Harbeck. In pursuance of this arrangement a contract in writing was executed between Harbeck and Adams, and Adams gave his bond to Harbeck.

March 22d, 1878, the McKees gave to Adams the bond and mortgage as they had agreed to do.

The McKees did not pay the $3,000 to Harbeck, and Adams was forced to pay the sum, which he did on April 7th, 1879, taking from Harbeck an assignment of the $5,700 mortgage.

June 9th, 1879, Adams filed his bill in this court to foreclose the mortgage given to him, and a decree of foreclosure and sale was entered February 3d, 1880. By this decree the property

was ordered to be sold in parcels, and the *fieri facias* directed that the sale should be made first of Plot No. 1, and out of it Adams should be paid the amount due on his mortgage, viz., $3,479.56, and costs, $138.64; that Plot No. 2 should next be sold, and out of the proceeds Mr. Cowan's mortgage debt should be paid, namely, $2,649.50, any balance remaining to be paid to Adams in the event of his debt not being discharged by the proceeds of Plot No. 1; in the next place, that Plot No. 3 should be sold subject to the mortgage of the Mutual Life Insurance Company, and the proceeds appropriated to the payment of any balance due Mr. Adams. This plot was also subject to the Hinchliffe mortgage upon it, he not being a party to the suit. After several adjournments the property was sold on the 31st of July, 1880, and struck off to James H. Rogers, solicitor for Adams, the complainant, as follows: Plot No. 1, for $400; Plot No. 2, for $2,500; Plot No. 3, subject to the insurance company's mortgage, for $3,000. Mr. Rogers signed the conditions of sale as solicitor for Adams, as bought for $5,900.

The deed was not made immediately after the sale, but Adams went into possession of the property and put it in the hands of his real estate agent, James A. Morrisse. A sale of Plot No. 1, was afterwards effected by Mr. Eckings, a real estate agent, to John H. Kemp, for $2,500, and Adams took a deed from the sheriff dated July 31st, 1880, the sheriff's affidavit being made on the 13th of November, 1880, the consideration expressed being $400, the amount of the bid; and Adams and wife, by deed dated November 15th, 1880, conveyed it to John H. Kemp for the consideration of $2,500. Kemp retained $701.07 for taxes due, and paid the balance—$1,798.93—to Adams, who applied it, with the amount of rents which he had received from the property, upon his claim.

In the face of the decree of foreclosure and sheriff's sale to Adams, Mary Ann McKee, personally, made an application to the Mutual Life Insurance Company, November 19th, 1888, for a loan of $7,000 upon Plots Nos. 2 and 3, which adjoin one another, and this loan was passed by the committee of the insurance company to Mrs. McKee. This was subject, of course,

to the title being satisfactorily vested in her when giving the mortgage.

Afterwards, John Shaw, who was a member of the firm of Shaw & Hinchliffe, wealthy brewers of Paterson, and a warm personal friend of Mrs. McKee, was substituted as the party to whom the loan was to be made. This was effected, not by his filing a new application, but by an alteration of the endorsement on Mrs. McKee's former application. He went twice at least, personally, to New York with reference to the loan; Mr. White, the insurance company's real estate agent, says that Mr. Shaw's substitution was an arrangement the lawyers, who passed the papers, had to deal with, that the loan was passed by the committee to Mrs. McKee. The sheriff, by deed dated July 31st, 1880 (the sheriff's affidavit annexed, however, was not verified until January 17th, 1881), for the expressed consideration of $5,500, conveyed the two tracts Nos. 2 and 3 to John Shaw, who is therein described as the purchaser at the sheriff's sale of the property for that amount. Mr. Shaw then gave his bond and mortgage to the Mutual Life Insurance Company, upon the same property, to secure the loan of $7,000. These papers are both dated July 31st, 1880, and are both acknowledged under date of January 17th, 1881. It seems that the balance due Robert Adams—$1,646.46—was paid by check of Shaw & Hinchliffe, dated January 14th, 1881, and the taxes on the two lots, amounting to $910, by check of the same firm, dated January 18th, 1881.

The Mutual Life Insurance Company gave Mr. Shaw a check dated January 18th, 1881, for $7,000, which he endorsed over to John McClure, one of the counsel of the insurance company, who retained his fees and the amount due on the prior mortgage of the insurance company, and paid the balance—$4,354.03— by check dated the same day, to Mr. Shaw. This he deposited to the credit of his private account in the First National Bank of Paterson, January 19th, 1881, and the same day gave a check to Henry Cowan for $2,752.86 in settlement of his mortgage and one to John Hinchliffe, Sr., for $700, the amount of his mortgage. January 22d, 1881, he gave his check to Jacob H. Blau-

velt, county clerk, for his fees, "searching title Mrs. McKee." On January 20th, 1881, the deed from the sheriff to Shaw and the mortgage from Shaw to the Mutual Life Insurance Company were put upon record. Mr. Shaw placed the property in the hands of Mr. Eckings, as his real estate agent, but Mrs. McKee continued to reside in one of the houses up to the time of her death without the payment of rent.

Mr. Shaw went to Europe somewhere about August 22d, 1881, and died there in November following. He was a widower with several children. He left a last will and testament, which was duly admitted to probate in Passaic county, containing the following provision :

"I give, devise and bequeath unto J. W. Griggs and Henry L. Butler of Paterson, New Jersey, and to their heirs and assigns forever, all my real and personal estate of whatsoever description and wheresoever situated to be by them or the survivor of them, held upon the following trusts,"

specifying the particular trusts, the same being for the benefit of his children.

Mrs. McKee died at her residence in Paterson, in December of the same year, leaving her surviving, her husband and her children, the complainants, Annie McKee, Minnie, who has intermarried with Edward W. Champion, James McKee, Jr., and Joseph McKee, the two latter being infants.

James McKee, the father, by deed dated November 24th, 1890, released to the complainants all his interest in the said lands.

The defendants, soon after the death of Mr. Shaw, took possession of the property and continue in possession thereof.

The bill, which is filed by the complainants, as heirs-at-law of Mary Ann McKee, and as assignees of James McKee, alleges that when Robert Adams purchased the Harbeck mortgage and entered into the agreement named, his sole object was the befriending of James and Mary Ann McKee, without the design or intention to make any profit therefrom, and that he only required to be secured, and agreed, if James or Mary Ann McKee would pay the $3,000 and interest, for which he was obligated to Harbeck, and save him harmless on his bond, he

would deliver up the mortgage for $5,700, on which there was, under the settlement, only $3,000 due. It further alleges that for a long time prior to June 9th, 1879, and up to his death, John Shaw and Mary Ann McKee were on terms of very great intimacy, and had maintained most friendly relations for years; that she looked to him for advice on all matters of business and placed implicit confidence in him. That when she was notified by Adams that she must pay the money or he would commence suit, she applied to her friend and confidential adviser, John Shaw, to assist her in her difficulty, and to aid her and devise ways and means for the redemption of the mortgaged premises, or some part thereof; that finally an agreement was made between her and Mr. Shaw with reference to the property by which he was to take the title, a part of it in his own name, and raise money on the security thereof, advancing what might be necessary to pay off the encumbrances, and should hold the said lands in his own name and enjoy the rents and profits until such time as the rents and profits should, with the interest thereon, equal the sum advanced by Shaw with interest, or until Mrs. McKee, her heirs or assigns, should redeem. That it was distinctly understood between Mrs. McKee and Adams that she should have time to redeem Plots Nos. 2 and 3, after applying the proceeds of the sale of No. 1 to the payment of the amount advanced by him to Harbeck, and that, relying on this, they did not attend the sale nor secure the attendance of others, but permitted Adams to buy at grossly inadequate prices; that it was not intended by the McKees, or by Shaw, or by Adams that the sheriff's sale should be an absolute one, but that it was expressly agreed that Mrs. McKee should be at liberty to redeem the property, and that in this way the title was obtained at a grossly inadequate price; claiming that the conveyance should be held to be only a mortgage to secure the amount advanced, and charging that Shaw held the land subject to the right of redemption which he always recognized in his lifetime; that Shaw held the title subject to the $7,000 mortgage, having advanced only $1,046.46; that the agreement was intended to be reduced to writing, but that was never done, and it prays that the deed

from the sheriff to Shaw may be declared to be a mortgage, to secure the money advanced by him in respect to the premises, and redeemable according to the agreement, and for an account, and that the complainants may redeem, offering to pay what may be due, or that the property should be sold and the equities adjusted.

It is quite clear that no recovery can be based upon the parol agreement alleged to have been made by Mary Ann McKee with the testator of defendants. It admittedly rests in parol, and the answer denies that such agreement was made. There is no fraud alleged in the case, and in this aspect the act of the defendants would simply amount to a refusal on their part to carry out the oral agreement of the testator, John Shaw.

Judge Dodd, in *Wakeman* v. *Dodd, 12 C. E. Gr. 564,* says: " Where the case is free from fraud, and the wrong on the part of the defendant consists solely in refusal to do what he agreed, an answer denying the agreement is a good answer to the bill. The bar to the complainant's suit is then complete, because no proof of the parol agreement can then be admitted, such proof being illegal by the statute."

In *Walker* v. *Hill's Exrs., 7 C. E. Gr. 513,* Judge Depue (at *p. 519*) says : " The defendants having denied the existence of any agreement whatever with respect to the purchase of the land, are entitled to the benefit of the statute of frauds without pleading it as a defence. The effect of a total denial of any contract is to put the complainant to proof of the trust by legal and competent evidence, which by the statute is required to be in writing. * * * The jurisdiction over transactions of this nature rests on the ground of fraud and oppression on the part of the purchaser, by means of which he has obtained the property of the debtor at an inadequate price, under the assurance of a contract to reconvey the property to him, or to hold the same subject to future redemption."

Recovery must therefore be had, if at all, upon the other aspect of the case which is presented, namely, that John Shaw stood in a fiduciary relation to Mary Ann McKee, and in such

relation acquired the title to the premises under such circum-stances that it would be inequitable for him to retain it.

In the case of *Wakeman* v. *Dodd,* above cited, the same learned judge before quoted from says (at *p. 567*) : " While the imputation of intentional fraud may in this view be avoided, it is manifest from the evidence that the defendant was, at the time of the purchase, the complainant's confidential adviser. Standing in this fiduciary relation, the beneficial results of the purchase must be hers instead of his. The elementary principle of equity, by which a trustee is disabled to purchase for his own benefit the property of his *cestui que trust,* is too plainly applicable to the facts of this case to leave room for controversy or doubt. Without reference to fraudulent intent, and irrespective of the parol contract alleged in the bill, the facts, as they are pleaded and proved, conclusively evince that, as to the property in question, the defendant was the complainant's adviser, and consequently, trustee. As such he must be held to account." Referring to the case of *Fox* v. *Mackreth,* and the accompanying notes in *1 White & T. Lead. Cas. 92–209.*

In *Tate* v. *Williamson, L. R., 2 Ch. 55,* Lord Chancellor Chelmsford (at *p. 61*) says: "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character, have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed."

In *Billage* v. *Southee, 9 Hare 534,* Vice-Chancellor Sir George

James Turner (at *p. 540*) says : " No part of the jurisdiction of the court is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other ; and in my opinion, this part of the jurisdiction of the court cannot be too freely applied, either as to the persons between whom, or the circumstances in which it is applied.   The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatever may be the nature of the confidence reposed, or the relation of the parties between whom it has subsisted.   I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised—those of trustee and *cestui que trust*, guardian and ward, attorney and client, surgeon and patient—to be merely instances of the application of the principle."

John Shaw was an Englishman, and Mary Ann McKee was of the same nationality.   He was acquainted with her before her marriage to James McKee ; their acquaintance was so intimate that they addressed one another by their Christian names ; he was a frequent visitor at her residence, both before and after her marriage, and took great interest in her welfare, and expressed the same on several occasions.

To understand the exact nature of the transaction now attacked it is necessary to examine the condition of Mrs. McKee's affairs from the date when Adams intervened in her behalf.   There is no uncertainty with reference to the latter gentleman's position— he came in as the friend of the McKees, to save, as he says, their property from foreclosure.   The Harbeck mortgage was due and he was urgent for payment.   James McKee, the husband of Mary Ann McKee, seems to have been an unthrifty person, engaged in horse transactions, following the trotting circuit; and, from all accounts, spending all the money he could obtain. His relations with his wife would seem to have been anything but pleasant, and resulted at last in their separation and the determination on her part to procure a divorce from him.   These strained relations existed during the time of the transactions under review, and up to the serious illness of one of their chil-

dren, which it appears resulted in their reconciliation just before Mrs. McKee's death.

McKee insisted that Harbeck owed him, for services rendered in certain horse transactions, an amount sufficient to discharge the mortgage; a claim which Harbeck denied entirely, and he had either commenced or threatened to bring a suit for foreclosure.

Adams intervened to effect a settlement if possible; he obtained from Harbeck a proposition, to which, on consulting with the McKees, and obtaining their consent, he agreed. By this he became responsible to pay the sum of $3,000 for them in one year in the event of their not doing so. Mr. Adams says, in making this arrangement he had no expectation of profit or any desire for any; his sole object was to befriend Mr. and Mrs. McKee. He seems to have had no expectation of being called on to pay the amount, but relied on Mr. and Mrs. McKee's promise to pay Harbeck the $3,000 at the end of the year.

He, however, procured from them the bond and mortgage covering the three tracts of property, but neglected to insist on their giving these securities until March, 1878. The bond which he then obtained contains the recital, substantially, that Adams had purchased from Harbeck the $5,700 mortgage for $3,000, and given his own bond therefor, the mortgage being retained by Harbeck as collateral, with the condition that if the McKees paid Adams or Harbeck the $3,000, with interest, the $5,700 bond and mortgage were to be delivered up to them and the bond of Adams satisfied.

In the bill filed by Adams subsequently to foreclose this mortgage, he says all the transactions referred to on his part were made and entered into by him in order to befriend said James McKee and Mary Ann McKee, and in order to enable them to settle various suits at law and in equity, and also to settle matters in difference between them and said Harbeck, and to enable said Mary Ann McKee to save the property described in said mortgage from foreclosure.

Adams' bond fell due on the 2d day of October, 1878. In the previous summer he repeatedly called Mrs. McKee's attention to that fact and urged her to prepare for its payment; he

wrote her two letters at least to that effect. He also went to see her with reference to a settlement, and on several occasions met John Shaw at her house.

It appears, also, by the testimony of other persons, that Shaw was a frequent visitor at this time at Mrs. McKee's.

The statements made by Mr. Adams as to his conversations with Mr. Shaw on these occasions, and on others when he met him on the street, are not, of course, invoked with any idea that a contract could be proved therefrom, but as indicating the relations which existed at the time between him and Mrs. McKee. That their acquaintance was an intimate one is shown by the way they addressed one another and their being together under the circumstances to which Mr. Adams testifies. He says that on several, if not all of these occasions, Mr. Shaw censured James McKee, the husband, for the way in which he was treating his wife's property, and expressed the fear that he would sooner or later impoverish her; that on several occasions Shaw stated his willingness and intention to take the property, care for it for her, and when it was all arranged place it back in her hands. These conversations were had both before and after Mr. Adams' bond fell due, and of course some were prior to his foreclosure and the sale of the property. One of them may be given as a specimen of all:

"I was going back and forth to Mrs. McKee's about this business and I met Mr. Shaw there a number of times, and one particular time, as I was getting out of my wagon, Mr. Shaw came out of the front door with Mary Ann McKee, and I got into a conversation with Mr. Shaw about this business. Mr. Shaw began the conversation and told me what a shame it was about James McKee treating his wife, and how that he would go through all her property, and he was willing to take the property in his hands, put it in order and look after it for Mrs. McKee's benefit, and when he got it all fixed up he was to put it back again in Mrs. McKee's hands; and while he was doing this he pointed with his finger and said, 'she can live in the first story of that house, next to the corner.'"

On cross-examination by defendants' counsel he was asked:

"Q. Did Mr. Shaw, when he spoke to you about taking the property, refer to how or when he should take it?

"A. Did not specify any time, just in conversation, that is all.

"*Q.* Who was present at'that conversation ? ·

"*A.* Mrs. Mary Ann McKee and one· of her daughters; they were small at the time."

And further, on cross-examination—

"*Q.* From that conversation what did you gather his purpose and plan to be? (Referring to one of the conversations.)

"*A.* His plan, as he told me, was to repair the house, allow Mrs. McKee a certain sum of money to live on, appropriate the balance to the house in such shape, and when he had paid all off he was to turn the property all back again to her; and I thought to myself, 'you will have a long time waiting;' that is what makes me remember the conversation."

Adams says that he commenced his foreclosure expecting, from what had taken place, that he would get his money out of Shaw. That result, however, was not directly reached, and the foreclosure was commenced, and Adams left the matter in the hands of his solicitor, Mr. Rogers, and moved from Paterson to the city of New York.

Just before the sale it appears that Mrs. McKee was in great distress and worry with reference to her property. Mr. Shaw is shown to have visited her just prior thereto and was at her house on the day of the sale. For some reason not distinctly explained she did not attend the sale, and the property was bought in by Mr. Adams' solicitor. · This, of course, entitled Mr. Adams to a conveyance of the property, but that he intended by the foreclosure and sale only to hold the property for his own security is evident, not only from his declarations but from his subsequent conduct. He says that his object in buying in the property was to protect· himself and also to protect McKee; that after receiving his $3,000 Mrs. McKee was then to have the property, but at that time he would not have sold or conveyed away this property so as to cut off Mrs. McKee's rights; that she was first and last with him all the time; he was looking after her interests, and 'that he made the express promise or pledge to both her and her husband a number of times that he would only hold the property for his own protection, and that he wanted no profit in it whatever. If these promises were made prior to the sale, and· induced her to let him

purchase the property at an inadequate price, the court, under the principles stated in *Walker* v. *Hill's Exrs.*, *supra,* would have held him to his agreement on the ground that it would be a fraud in him to disregard it. His whole action, however, shows that he intended to live up to these promises. He did not at first take a deed from the sheriff in his own name or close the matter on the basis of the sheriff's sale; he took possession of the property it is true, and put the same in the hands of his agent, Mr. Morrisse, but he allowed Mrs. McKee and her family to remain rent free, and directed his agent to keep an account of the receipts of and expenditures on the property so that the same might be incorporated in any adjustment of their affairs. When the $2,500 purchaser had been procured for the Willis street property, which had been struck off to him for $400, he did not treat it as absolutely his own, but credited the net proceeds of the sale and the rents upon the indebtedness, and he held open the other portion of the sale until such time as Mrs. McKee was able to make a settlement.

The court, under these circumstances, would never have permitted Adams to have denied her the right to redeem the property, and it is not, under the circumstances, credible that this condition of affairs existed without John Shaw being thoroughly conversant with the facts.

Mrs. McKee, in November, made a personal application to the Mutual Life Insurance Company of New York for a loan of $7,000 on the two plots on Main street, and the loan was granted upon her application.

What was the situation now, so far as Mrs. McKee was concerned? Her property had been sold at sheriff's sale to Mr. Adams; he had realized, by an advanced price for one plot and rents, all but some $1,600 of his claim. All he desired was his money. He had promised, and given evidence that he intended, to hold the balance of the property, first, as his security, next, for her benefit. He would not have sold without giving her the preference. The loan of $7,000 would not enable her to entirely pay off the encumbrances—they amounted to about $1,600 more. Some ready money, or person of undoubted financial

ability, must be secured to get the title from the sheriff and get temporary control of the Cowan and Hinchliffe mortgages. Her relations with her husband were strained, if they were not at the time living in a state of separation. Difficulties were apparent in the way of her taking the title and giving a mortgage to the insurance company, if she had the funds to meet the necessary payments. But the fact is clear that Mr. Adams was maintaining the situation for her benefit—that he would not transfer his right to the title to any but one who was to protect her. It is under those circumstances that Mr. Shaw appears in positive connection with the property. He was her friend, sympathized with her, and had told Mr. Adams of his intention to protect her. He first had himself substituted as the person to whom the loan was to be made by the insurance company. His financial ability enabled him, on January 14th, 1881, to pay with the checks of his firm the balance—$1,646.46 —due Mr. Adams, as well as the taxes due—$910—and to obtain control of the Cowan and Hinchliffe mortgages, which he did not pay until he received the money from the insurance company. It is fair to assume, from the evidence, that Mrs. McKee could, without difficulty, have found a purchaser for this property at a figure which would have discharged all encumbrances and have left her a handsome balance. Mr. Adams held his bid at her disposal to deal with it in that way. That Mr. Shaw, holding the confidential and friendly relations he did with her, took her place in the favorable position Mr. Adams held open, is not consistent with any other theory than that he did it for her benefit. There can be no doubt that when he took the title he knew fully the terms, in respect to the rights of Mrs. McKee, upon which Mr. Adams held it. It was not possible, therefore, for him to acquire, as against Mrs. McKee, a better title than Mr. Adams had. By taking title he simply acquired Mr. Adams' rights and stood in his place. *Tatem* v. *Powell, 5 Dick. Ch. Rep. 316.* These circumstances and his repeated declarations would have made it a fraud for him in his lifetime to have denied she had any right in the property. But his conduct was entirely consistent with the theory that he had taken the title

and was holding it, just as he had said he intended to do, for her, after he received what he had expended on it.

Mr. Eckings, in answer to a question as to what Mr. Shaw said to him about his purpose and intention as to the property, whether he was doing it for himself or what he intended to do, says that, under representations that $7,500 would cover the indebtedness against the property, Mr. Shaw started in to buy it and protect Mrs. McKee.

Shaw put the property in the hands of his real estate agent, but Mrs. McKee and her family were permitted to remain in the part they occupied, rent free. The rents were to be applied to the repair of the buildings, and an accurate account kept. He was paid by Mr. Eckings, by check dated April 12th, 1881, $52.50, which appears, by the entry on the stub, to have been for his expenses in connection with making the transfer and negotiation of loan, recording papers &c. This, it appears, was partly for Mr. Eckings' services. The amount was charged by Eckings in the account for rent. This is a very significant circumstance, for, if Mr. Shaw had purchased this property absolutely, there would be no reason in his collecting his expenses from the account of rents; but if, on the other hand, he was only holding it for Mrs. McKee, and was to be repaid his advances, such action would be perfectly consistent. Mr. Eckings also states that he had a conversation with Mr. Shaw, as follows:

"Just previous to his leaving for Europe, we met on the street, and he told me that the claims against the property had amounted to such a sum that it would be out of the question to consider the redemption of the property; that he could not see how Mrs. McKee could at all consider the redemption of the property."

This conversation renders it positively certain that there existed an understanding between Mr. Shaw and Mrs. McKee, by which she was to have the right to redeem the property.

Mr. Shaw paid on account of the property, on taking the title, the following amounts:

By Shaw and Hinchliffe check to Robert Adams....... $1,646 46
By same to Allen, receiver of taxes......................... 910 00
To John Hinchliffe, for interest............................. 9 10

McKee v. Griggs.

| | | |
|---|---:|---:|
| To Henry Cowan, principal and interest.................... | $2,752 | 86 |
| To John Hinchliffe, principal................................ | 700 | 00 |
| To county clerk, for searches................................ | 19 | 28 |
| To Mutual Life Ins. Co., old mortgage...................... | 2,566 | 64 |
| To insurance company counsel................................ | 79 | 33 |
| | $8,683 | 67 |
| Received from insurance company............................ | 7,000 | 00 |
| Amount originally advanced. ........................ | $1,683 | 67 |

At this time Mr. Eckings estimated the value, and so stated to Mr. Shaw, to be $10,000. This is the lowest estimate put upon the two properties. Mr. Adams gives his opinion of the value at the time, $16,000 ; Mr. David Henry, at from $16,000 to $18,000 ; Mr. William White, at $14,000 ; Sheriff Rossiter, at $11,000, but says that eight per cent. of value ought to be represented by the rental, and on this basis, the rent in 1880, by the testimony estimated at $1,104, the value would be $13,800, and on the rental stated by Mr. Eckings, of $1,056, the value would be $13,200. Mr. Shaw stated the value, to Mr. Adams, at $25,000, but this appears, by the evidence, to have been speculative. There is, however, a profit of from $1,400 to $7,600 be-between $8,683.67, actually paid by Mr. Shaw, and the true value which Mr. Shaw acquired by an advance of $1,683.67, if he had bought the property out and out. In my opinion it would be doing an injustice to his memory to hold that he made an arrangement, or engaged in a transaction, by which he took any such advantage of Mrs. McKee, whom he was professing to serve. It is altogether more consistent with the circumstances of the case to believe that he made an arrangement with Mrs. McKee, by which he took her place in the advantage Mr. Adams was willing to extend to her, and advanced the sixteen hundred and odd dollars to assist her to hold the title as security for any expenditure he might make.

In my opinion Shaw occupied towards Mrs. McKee a relation of trust and confidence, and the deed must be declared a mortgage as security for Mr. Shaw's advances.

The agent, in Mr. Shaw's lifetime, and the executors and

.13

trustees have laid out money in the repair and improvement of the property, and have been in receipt of the rents.   There must be a reference to a master to ascertain the amount paid out and received on account of the property.